UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THOMAS FLORANCE,


 -vs-                                                                    COMPLAINT
                                                                         JURY DEMAND
BROOME COUNTY, FREDERICK J. AKSHAR,                    9:24-cv-536  (LEK/ML)
ROBERT CHARPINSKY, PHILIP STEPHENS,
TRINITY SERVICES GROUP, INC.,



                         Defendants.
_____

## PRELIMINARY STATEMENT

1.  Thomas Florance was forced to work without pay in the kitchens at the Broome County Correctional Facility ("Jail") for the several weeks he was incarcerated there as a pre-trial detainee.  Although he was told he would be paid, he was not. Corrections officers repeatedly threatened to take away his "good time"[1] or put him in "keep lock"[2] if he refused to work. These threats guaranteed his free labor for nearly two months.

2.  After weeks of frustration with being forced to work for no pay, Mr. Florance refused to work on February 14, 2024. The Jail made good on its threats. He was put on a "keep lock" pending a disciplinary hearing to determine his punishment.

---

[1] "Good time" refers to the practice of prisoners earning merit based early release. While this has no actual bearing on pre-trial detainees – as they do not yet have good time – the threat of taking away good time is still effective because those prisoners awaiting trial may not understand the legal nuances of when and how they accumulate good time.

[2] "Keep lock" is a form of solitary confinement. It is a practice at the Broome County Correctional Facility in which prisoners are confined to their cell for a period of time.  Prisoners on "keep lock" status are restricted to their cell.

3. In this civil rights lawsuit, Thomas Florance, contends that by forcing him to work without pay Defendants violated his rights under the Thirteenth Amendment of the United States Constitution, Trafficking Victims Protection Act (18 U.S.C. § 1589), and New York State Labor Law.  He seeks both compensatory and punitive damages.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a)

5. Venue is proper in the Northern District of New York, pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), as all relevant events giving rise to the claims in this action occurred in this district.

## PARTIES

6. Plaintiff, Thomas Florance is a 39-year-old resident of Broome County.  He was a pre-trial detainee at the Broome County Jail for about two and half months from November 2023 to February 2024.

7. Defendant Frederick J. Akshar is the Sheriff of Broome County and head of the Broome County Sheriff's Office.  Sheriff Akshar is an elected official and has final policy making authority for all policies that govern the Corrections unit of the Sheriff's Office. Sheriff Akshar has supervisory authority over all Sheriff's Office staff and is personally involved in creating, authorizing, and maintaining the policies and customs challenged by the Plaintiffs. He is sued in his individual capacity.

8. Defendant Broome County is a municipal corporation organized under the laws of New York. The Broome County Sheriff's Office operates the Jail and is an agency of Broome County.

9. Defendant Robert Charpinsky is the administrator of the Jail and an employee of the Broome County Sheriff's Office.  He was personally involved in authorizing and maintaining the policies and customs challenged by the Plaintiff.  He is sued in his individual capacity.

10. Defendant Corrections Officer Philip Stephens is a corrections officer employed by the Broome County Sheriff's Office. He is sued in his individual capacity.

11. Trinity Services Group, Inc., ("Trinity"), is a subcontractor for the Jail. Trinity is contracted by the jail to provide all necessary food services. It also supervises, trains, and manages all prisoner[3] and non-prisoner food service workers at the Jail.

## FACTS

***Defendants Policies and Customs Coerce and Threaten Prisoners to Use their Labor for Defendants' Benefit***

12. The Jail is a correctional facility located in Binghamton, New York.  As of February 2024, there were 322 prisoners held at the jail, approximately 15% of whom are serving a sentence.

13. The Jail holds both men and women who are awaiting trial or transfer to the New York State Department of Custody and Community Supervision, or who are serving a short local sentence. All the men and women held at the Jail are in the custody of the Broome County Sheriff.

---

[3] Prisoner refers to both people held at the jail awaiting trial and people serving a sentence.

14. Upon admission to the Jail, all prisoners go through an initial classification process. A prisoner's classification determines their housing unit and the level of restrictions – if any – placed on the prisoner.

15. All sentenced prisoners held at the jail are given work assignments. Prisoners awaiting trial who meet the classification requirements – and are in good standing – may also be eligible to work.

16. To entice pre-trial detainees to work, Jail staff promise they will be paid for their work. On three occasions since becoming the Sheriff, Defendant Akshar has come to the Jail and told the prisoners that they would be compensated for their labor. Upon information and belief, Defendant Charpinsky has similarly promised prisoners they would be paid for their work.

17. However, once prisoners are assigned to work programs, they are not paid. Prisoners awaiting trial are treated the same as the sentenced prisoners. If they refuse to work, they are threatened with loss of "good time," placement on keep lock status, or other sanctions.

18. The threats by the Jail staff create a culture of fear among the prisoner workers. The prisoners know that if they refuse to work, they will be punished, and if they lose their accumulated good time, will end up incarcerated for a longer period.

19. All prisoners who are given work assignments in laundry or kitchen are housed in H-Pod at the Jail. Other than pre-trial detainees with work assignments, H-Pod houses all sentenced prisoners.

20. One of the work programs offered at the Jail is food service. The jail contracts out food service to Trinity Services Group, Inc., a private corporation that is headquartered in Florida.

21. Pursuant to the contract between Broome County and Trinity, the Jail must provide seven prisoners to Trinity to work in food service. Prisoner labor lessens the operational costs of food service for both Broome County and Trinity. Without free prisoner labor, the County or Trinity would have to hire more staff to complete the daily food service.

22. Prisoners are assigned to work six-to-eight-hour shifts by the County and Trinity. At minimum they work three to four shifts per week. Often when coverage or additional help is needed prisoners are asked to "volunteer" under threat of being placed on keep lock status.

23. The job duties for kitchen work are determined by Trinity staff and include preparing food on the Jail's food trays, serving food, collecting trays, and washing the used food trays and cleaning the work area. The prisoners assist with the food service for meals provided to the entire facility.

24. It is only after serving all the other prisoners and corrections officers that the prisoners working in the kitchen can eat their meals.

25. Prisoners who work in food service are not paid by either Trinity or the County.

26. By using forced prisoner labor Trinity and the County avoid paying minimum wage, state mandated benefits, and payroll taxes.

27. Prisoners are trained on what is required for their job assignments by Trinity staff.

28. Trinity employees supervise the prisoners' work during food preparation and food service shifts in the kitchen. They provide work instructions for prisoners on what will be required of them before their shift.

29. One corrections officer per shift is assigned to supervise the prisoner workers. This officer assists in both supervising and directing the workers.

30. Trinity employees report misconduct or poor prisoner work to jail staff potentially subjecting the prisoner to discipline.

31. Prisoners who are disciplined during work are immediately removed from the kitchen and placed on keep lock status in their cell.

32. Trinity knew or should have known about the Jail's threats of disciplinary action against prisoners for refusing to work through their employees' own observations during work shifts and statements from the prisoner workers to Trinity employees.

33. Trinity knowingly benefits financially, by way of reduced labor costs, from participating in the forced labor of prisoners.

34. Broome County benefits financially because the use of forced prisoner labor helps defray the institutional costs associated with running their food service program.

*Thomas Florance's Forced Labor at the Jail*

35. Mr. Florance was arrested on or around November 8, 2024, and transported to the Jail. Mr. Florance went through the routine Jail intake procedures. During intake – and throughout his first two weeks at the Jail – he heard from corrections officers and other prisoners that Sheriff Akshar was going to start paying prisoners for work duties.

36. About two weeks into his pre-trial detention, Mr. Florance was approached by Jail staff about working. They were aware he had previously worked while incarcerated at the Jail

and asked him if he would be willing to work again. Mr. Florance was hesitant to work, but the corrections officer told him that Sheriff Akshar had decided that all workers would be paid.

37. Mr. Florance agreed to work again despite his frustrations that he had not been paid during the previous periods of time he worked at the Jail. His decision was due in part to Sheriff Akshar's promise of payment and in part due to the threats he knew he would face if he refused.

38. He was then assigned to work for Trinity in food service.

39. Before starting work, Mr. Florance signed a document acknowledging the rules related to working for Trinity in the Jail's kitchens.

40. After he signed the work rules, he was transferred to H-pod. Upon his arrival, Mr. Florance asked the other prisoners if they were being paid for their work. Several of them had been told they would be paid but none were currently being paid for their work. When confronted with questions about prisoners getting paid for their work, Defendant Stephens and the other corrections officers assigned to H-pod assured Mr. Florance and the other prisoners that Sheriff Akshar would approve payment soon.

41. Mr. Florance was awoken at 5 a.m. each workday by a corrections officer. He and the other prisoners assigned to that shift would then get ready and be escorted to the kitchen to start their shift at 6 a.m.

42. If he was scheduled to work – or was chosen to cover the shift of another prisoner – Mr. Florance was expected to work with no exceptions.

43. After a short period of time working in the kitchen for Trinity, it became clear to Mr. Florance that it was not likely he would be paid.

44. On many occasions, Mr. Florance expressed his discontent with being forced to work without pay to Defendant Stephens and other corrections officers. However, they told him that if he did not work, he would be put on "keep lock" status.

45. Defendant Stephens and the other corrections officers would also regularly threaten Mr. Florance with the loss of his good time if he refused to work. As a pre-trial detainee, Mr. Florance did not have any accumulated good time. However, he feared such a sanction might affect his ability to accumulate good time after his sentencing or his ability to earn credit for the time spent incarcerated pre-trial if he must serve a sentence.

46. The Jail's policies forced Mr. Florance to work. It did not matter if he was too tired, mentally unprepared to work, or just did not want to work that day. There were several days Mr. Florance did not want to work but did so anyway because he feared the disciplinary consequences of refusing.

47. Each day he worked, Mr. Florance's shift would begin at 6:00 a.m. and last until 2:00 p.m. He worked four or five eight-hour shifts per week, approximately 32 to 40 hours a week.

48. His work assignment included helping with the service and preparation of breakfast and lunch for the entire facility.

49. Mr. Florance's job duties included serving and assisting in the handling of all the Jail's food, filling trays, handing out the trays of food, stacking the empty trays, and washing the used trays.

50. Mr. Florance estimates he handled five-hundred trays for each meal he worked.

51. Because he and the other prisoners forced to work in food service could eat their own meals only after the other prisoners and the corrections officers had been served, occasionally Mr. Florance and his fellow workers received less than a full ration.

52. Mr. Florance had a work schedule created by Trinity and Jail staff.

53. If another worker was unable to work on any given day, other prisoners in the housing unit would be required to come to work. Upon information and belief, these orders came from the civilian employee of Trinity in charge of the kitchen and the corrections officers in charge of gathering the prisoners for work.

54. Mr. Florance was ordered to work on his day off at least three times. On the first two occasions, he agreed to work out of fear of disciplinary action.

55. On the third occasion, on the morning of February 14, 2024, he was awoken at 5:00 a.m. by Defendant Stephens and directed to get ready to go to work.

56. Mr. Florance explained to Defendant Stephens that it was his day off and he was tired of being forced to work for no compensation.

57. Defendant Stephens stated to Mr. Florance that he did not have a choice and ordered him to get up and go to work.  Mr. Florance again refused to get up.  Defendant Stephens then threatened him with "keep-lock" and the loss of his good time.

58. Mr. Florance continued to refuse to work, and Defendant Stephens gave him a 24-hour "keep lock."

59. Defendant Stephens told Mr. Florance he would be locked in his cell on "keep lock" status for up to 15 days pending a hearing on the matter to determine his punishment.

60. On February 15, 2024, Mr. Florance filed a grievance challenging Defendant Stephens' decision to place him on "keep lock" status for refusing to work. The grievance form was returned the same day at about 1:22 PM and signed by Defendant Stephens.

61. The returned form included a handwritten message from Defendant Stephens stating: "You refused to work after a direct order to do so which caused your "keep lock" pending hearing discipline is not grievable."

62. In the afternoon of February 15, 2024, Mr. Florance was moved from H-Pod to a different housing unit.  Mr. Florance was held in solitary confinement on "keep lock" status for seven days until he made bail and was released from the Jail on or about February 21, 2024.

63. Mr. Florance never received compensation for the approximately 494 hours of work he performed for Trinity and Broome County.

## CLAIMS FOR RELIEF

### First Cause of Action

**(Violation of the Thirteenth Amendment)**
**(Against All Defendants)**

64. By virtue of the foregoing, Mr. Florance was forced to perform work for defendants without pay.  Mr. Florance was coerced to work without compensation under threat of physical punishment or restraint in violation of the Thirteenth Amendment to the United States Constitution.

### Second Cause of Action

**(Violation of the Forced Labor Provision of the Trafficking Victims Protection Act 18 U.S.C. § 1589)**
**(Against All Defendants)**

65. The Defendants forced Plaintiff to perform uncompensated work for Trinity at the Broome County Correctional Facility under Broome County and Trinity's food services contract.

66. Plaintiff Thomas Florance was not compensated for his work in the kitchen.

67. Defendants coerced this labor through threats of serious discipline and solitary confinement to his cell for several days.

68. Defendants saved costs associated with paying for kitchen and laundry work by using the uncompensated and coerced labor of Plaintiff to help prepare and distribute, meals at the Broome County Correctional Facility.

69. Defendants obtained the labor and services of Plaintiff by physical restraint or threats of physical restraint to Plaintiff. 18 U.S.C. § 1589(a)(1).

70. Defendants obtained the labor and services of Plaintiff by means of serious harm or threats of serious harm to Plaintiff. 18 U.S.C. § 1589(a)(2).

71. Defendants obtained the labor or services of Plaintiff by means of a scheme, plan, or pattern intended to cause the Plaintiff to believe that if he did not perform such labor or services, he would suffer serious harm or physical restraint, including solitary confinement. 18 U.S.C. § 1589 (a)(4).

72. Plaintiff was the victim of forced labor as defined by 18 U.S. C. §1589.

73. Defendants perpetrated the offense of forced labor against the Plaintiff. 18 U.S.C. §1595(a).

74. Defendants knowingly benefitted financially from participation in a venture they knew or should have known engaged in unlawful coercion of labor in violation of 18 U.S.C. §1589.

75. Pursuant to 18 U.S. C. §1595 all Defendants are liable for compensatory damages and the individual defendants are liable for punitive damages.

### Third Cause of Action

**(Failure to Pay Wages in Violation of New York Labor Law § 191)**
**(Against Trinity Group)**

76. By virtue of the foregoing, Plaintiff and Trinity had an employer-employee relationship as defined under New York Labor Law. As such, Trinity violated New York Labor Law Labor Law § 191 when they failed to pay Plaintiff for the work he performed at their behest and are therefore liable for damages under New York Labor Law Labor Law § 198.

### Fourth Cause of Action

**(Failure to Pay Minimum Wage in Violation of New York Labor Law § 652)**
**(Against Trinity Group)**

77. By virtue of the foregoing, Plaintiff and Trinity had an employer-employee relationship as defined under New York Labor Law. As such, Trinity violated New York Labor Law Labor Law § 652 when they failed to pay Plaintiff at least minimum wage for the work he performed at their behest and are therefore liable for damages under New York Labor Law Labor Law § 663.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court to:

(1) Award nominal and compensatory damages in an amount to be determined at trial;

(2) Award punitive damages against the non-municipal Defendants in an amount to be determined at trial;

(3) Award lost wages and liquidated damages pursuant to New York Labor Law §§ 198, 663;

(4) Award Plaintiff's costs, including reasonable attorneys' fees under 42 U.S.C. § 1988; 18 U.S.C. 1595(a); New York Labor Law §§ 198, 663 and other relevant provisions of law; and

(5) Grant any other and further relief, as the Court may deem necessary and proper.

Date: April 18, 2024                                                            Respectfully submitted,

/s/Joshua Cotter_____
**LEGAL SERVICES OF**
**CENTRAL NEW YORK, INC.**
**Joshua Cotter (518217)**
**Cassidy Lape***
**Willa S. Payne (517751)**
**Attorneys for the Plaintiff**
**221 South Warren Street, 3rd Fl.**
**Syracuse, New York 13202**
**(315)-703-6500**

*Application for admission pending